**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| EDWIN MUÑIZ NEGRÓN; ELIZABETH TORRES-TORRES; FRANCHELIS ORTIZ TORRES,<br><br>    **Plaintiffs**<br><br>      v.<br><br>WORTHINGTON CYLINDER CORPORATION, JOHN DOE 1 to JOHN DOE 50; JOHN DOE 51 to JOHN DOE 100<br><br>    **Defendants**<br><br>      v.<br><br>LIGHT GAS, CORP.<br><br>    **Third-Party Defendant** | **CIVIL. NO. 17-1985 (RAM)** |

**OPINION AND ORDER**

RAÚL M. ARIAS-MARXUACH, District Judge

Pending before the Court is Defendant Worthington Cylinder Corporation's ("Defendant" or "Worthington") *Motion In Limine and for Summary Judgment*. (Docket No. 87 and 89). Having examined the parties' arguments and the documents on the record, the Court **GRANTS** Worthington's *Motion in Limine and for Summary Judgment* and: (a) strikes the expected testimony of Plaintiffs' experts;

and (b) enters summary judgment dismissing the *Complaint* **with prejudice** for the reasons set forth below.

## I.   INTRODUCTION

This case arises from an accident which occurred on July 24, 2016 and resulted in burn injuries to Plaintiffs Edwin Muñiz-Negrón ("Muñiz-Negrón") and Franchelis Ortiz-Torres ("Ortiz-Torres"). (Docket No. 1 at 1). The third Plaintiff is Elizabeth Torres-Torres ("Torres-Torres) (collectively with Muñiz-Negrón and Ortiz-Torres, "Plaintiffs"). Id. This lawsuit followed on July 20, 2017. Id. The case was transferred to the undersigned's Docket on June 13, 2019. (Docket No. 79).

According to the *Complaint*, Plaintiffs purchased a propane gas cylinder manufactured by Worthington from a Sam's Club in Ponce, Puerto Rico in April 2016. Id. ¶ 28. Plaintiffs used the portable propane cylinder (hereinafter, "Propane Cylinder") to run their clothes dryer. Id. The accident allegedly occurred when they disconnected the Propane Cylinder from the clothes dryer for the first time to connect it to a barbecue. Id. ¶¶ 31-33.

The *Complaint* seeks to assert claims of strict product liability; design defect; manufacturing defect; lack of warnings; negligent design; negligent manufacturing; negligence *per se*; and breach of warranty resulting from the use of a Propane Cylinder that was researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and

otherwise released into the stream of commerce by Worthington. Id. ¶ 1. To support these claims, Plaintiffs' rely on the opinions of Mr. Víctor González-Padilla ("Mr. González-Padilla") and Engineer Iván Baigés-Valentín ("Eng. Baigés-Valentín").

On December 26, 2019, Worthington filed its *Motion In Limine and for Summary Judgment*. (Docket Nos. 87 and 89). Generally, it requests that the Court exclude Plaintiffs' experts' proffered testimony pursuant to Fed. R. Evid. 702 because: (a) the experts are unqualified to offer opinions in this case and (b) the experts' opinions are conclusory and not based on any reliable methodology. (Docket No. 89 at 4 – 24). Worthington also requests summary judgment dismissing the *Complaint* because upon exclusion of the experts, Plaintiffs will lack evidence essential to establishing a *prima facie* case against Defendant. Id. at 24-30.

On February 20, 2020, Plaintiffs subsequently filed *Plaintiff's [Sic] Motion And Memorandum In Opposition To Defendant's "Motion In Limine To Exclude Experts And For Summary Judgment" (Dockets 87 And 89)"* ("*Opposition*"). (Docket No. 98). Plaintiffs posit that Eng. Baigés-Valentín is qualified to testify as an expert witness given his teaching experience, work experience and experience in product testing, experimentation, and failure analysis. Id. at 9-10. They also claim that his analysis and determinations were based on the visual inspection of the valve and its components. Id. at 12. In essence, his visual inspection

of the valve, data gathered by him and his experience and
qualifications make his testimony reliable. Id. at 15-22.
Plaintiffs likewise aver that Mr. González-Padilla's testimony is
also reliable because he participated in several inspections of
the propane cylinder alongside other experts, including
Defendant's, and because of his qualifications of working in the
propane gas industry for over twenty-nine (29) years. Id. at 24-
25. His inspection of the propane cylinder valve and its seal,
which led to his four reports and to the conclusion that the damage
to the valve's seal was in part a result of a manufacturing defect,
are sufficiently reliable. Id. 26-28. Lastly, Plaintiffs'
*Opposition* also included additional material facts. (Docket No.
98-1). On March 13, 2020, Defendant filed a *Reply Memorandum in
Support of the Motion in Limine to Exclude Expert Testimony and
For Summary Judgment* ("*Reply*"). (Docket No. 104). It failed therein
to oppose Plaintiffs' additional facts.

As explained below, Plaintiffs lack competent evidence to
create a trial-worthy issue on their claims that the propane
cylinder had design, manufacturing, or warning defects. Simply
put, their proffered experts are not qualified to render opinions
concerning the gas valve involved in the accident. Mr. González-
Padilla is a businessman with twenty-nine (29) years of experience
in the field of distribution of propane gas. However, he has no
background, training or experience in the design and manufacture

of gas cylinders valves. Eng. Baigés-Valentín is a Mechanical Engineer with PH.D. in that same field but he lacks the relevant experience required of an expert witness for this case as he has never been involved in the design and manufacture of propane cylinder gas valves. Moreover, the proffered experts' opinions do not rest on sufficient facts or data and are not the product of reliable principles or methods. Consequently, neither expert's opinions would be reliable nor helpful to a jury to determine a fact in issue relevant to Plaintiffs' product liability claims.

## II.   APPLICABLE LAW

### A. Standard for admissibility of expert testimony under Fed. R. Evid. 702.

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. Specifically, Fed. R. Evid. 702 ("Rule 702") establishes that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the
principles and methods to the facts of the
case.

Thus, when faced with a proffer of expert testimony, the district court must determine whether the witness is qualified as an expert and has specialized knowledge that will "assist the trier of fact to understand the evidence or to determine a fact in issue." Bogosian v. Mercedes-Benz of North America, Inc., 104 F.3d 472, 476 (1st Cir. 1997). This is a two-step inquiry.

First, the court must make an initial determination that the proposed expert is qualified by "knowledge, skill, experience, training or education." Fed. R. Evid. 702; Bogosian, 104 F.3d at 476. Next, the court must perform a gatekeeper function by ascertaining whether the proffered expert testimony is helpful and reliable. See Fed. R. Evid. 702 advisory committee's notes to 2000 Amendments; Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 591 (1993); Bogosian, 104 F.3d at 476. In discharging this responsibility, the court must consider whether: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Gonzalez Arroyo v. Doctor's Ctr. Hosp. Bayamon,

Inc., 2020 WL 4516012, at *2 (D.P.R. 2020) (quoting Fed. R. Evid.
702). Therefore, when applying Rule 702, judges assume the "role
of gatekeepers to screen expert testimony that although relevant,
was based on unreliable scientific methodologies." González-
Pérez v. Gómez- Águila, 296 F.Supp.2d 110, 113 (D.P.R. 2003)
(citing Daubert, 509 U.S. at 597) ("Pertinent evidence based on
scientifically valid principles will satisfy those demands").

When performing their gatekeeping function, judges must
focus "solely on principles and methodology, not on the
conclusions that they generate." Clemente-Vizcarrondo v. United
States, 2020 WL 7448840, at *2 (quoting Daubert, 509 U.S. at
595). However, conclusions and methodology are not *entirely*
distinct from one another. There are instances where "**a court
may conclude that there is simply too great an analytical gap
between the data and the opinion proffered.**" Gen. Elec. Co. v.
Joiner, 522 U.S. 136, 146 (1997) (emphasis added). In practical
terms, under Daubert, **an expert cannot merely state their
qualifications, conclusions and assurances of reliability**. *See*
Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1319 (9th Cir.
1995). "Moreover, if a witness is relying mainly on experience,
he must provide more information for the Court to determine the
reliability of his testimony." Santa Cruz-Bacardi v. Metro Pavia
Hosp., Inc., 2019 WL 3403367, at *2 (D.P.R. 2019).

**B. Standard for Summary Judgment Under Fed. R. Civ. P. 56(a)**

Summary judgment is proper under Fed. R. Civ. P. 56(a) if a movant shows "no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence "is such that a reasonable jury could resolve the point in the [non-movant's] favor." Mercado-Reyes v. City of Angels, Inc., 320 F. Supp. 3d 344, 347 (D.P.R. 2018) (quotation omitted). A fact is material if "it is relevant to the resolution of a controlling legal issue raised by the motion for summary judgment." Bautista Cayman Asset Co. v. Terra II MC & P, Inc., 2020 WL 118592, at *6 (D.P.R. 2020) (quotation omitted).

The movant "bears the burden of showing the absence of a genuine issue of material fact." United States Dep't of Agric. v. Morales-Quinones, 2020 WL 1126165, at *1 (D.P.R. 2020) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). This burden is met "when the moving party demonstrates that the opposing party has failed 'to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" E.E.O.C. v. Kohl's Dept. Stores, Inc., 774 F.3d 127, 131 (1st Cir. 2014) (quoting Celotex Corp., 477 U.S. at 322).

The burden then shifts to the non-movant to present at least one issue of fact which is genuine **and** material. See Álvarez-

Cabrera v. Toyota Motor Sales, U.S.A., Inc., 2020 WL 3620204, at
*2 (D.P.R. 2020) (citing United States Dep't of Agric., 2020 WL
1126164, at *1)). A non-movant must do this "through submissions
of evidentiary quality," showing "that a trialworthy issue
persists." Robinson v. Town of Marshfield, 950 F.3d 21, 24 (1st
Cir. 2020) (quotation omitted). Thus, while a court will draw all
inferences in favor of the non-movant, summary judgment may still
be proper if the non-movant's case solely relies on improbable
inferences, conclusory allegations and unsupported speculation.
See Burke Rozzetti v. Ford Motor Co., 2020 WL 704860, at *3 (D.P.R.
2020) (quotation omitted).

It is well settled that "'**[t]he mere existence of a scintilla
of evidence in support of the plaintiff's position' is not enough
to ward off summary judgment.**" Irobe v. United States Department
of Agriculture, 890 F.3d 371, 380 (1st Cir. 2018) (quoting Anderson
v. Liberty Lobby, 477 U.S. 242, 252 (1986)) (emphasis added). The
non-movant "'must, with respect to each issue on which [it] would
bear the burden of proof at trial, demonstrate that a trier of
fact could reasonably resolve that issue in [its] favor.'" Id. at
377 (quoting Borges ex rel. S.B.M.W. v. Serrano-Insern, 605 F.3d
1, 5 (1st Cir. 2010)). Hence, "summary judgment is warranted if a
non-movant who bears the burden of proof on a dispositive issue
fails to identify 'significantly probative' evidence favoring his
position." Id. (citing Anderson, 477 U.S. at 249-250).

Lastly, Local Rule 56 also governs summary judgment. *See* L. CV. R. 56. Per this Rule, a nonmoving party must "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." Id. Adequately supported facts "shall be deemed admitted unless controverted in the manner prescribed by the local rule." Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH, 781 F.3d 510, 520 (1st Cir. 2015) (quotation omitted). The Rule also allows a non-movant to present additional facts "in a separate section." L.CV. R. 56 (c). However, parties may not incorporate numerous additional facts within their opposition. *See* Martinez v. United States, 2020 WL 5039242, at * 2 (D.P.R. 2020) (citations omitted). Litigants ignore Rule 26 at their peril. Id.

## C. Strict Products Liability Claims Under Puerto Rico law

The Puerto Rico Supreme Court has adopted the following strict products liability doctrine articulated by the California Supreme Court in Greenman v. Yuba Power Products, Inc.:

> A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being' and that "liability is not one governed by the law of contract warranties but by the law of strict liability in tort."

González-Cabán v. JR Seafood, 132 F. Supp. 3d 274, 279 (D.P.R. 2015) (quoting Rivera-Santana et al. v. Superior Pkg., Inc., 132 P.R. Dec. 115, 126, Offic. Trans. Slip. Op. at 6 (1992)). *See also* Greenman v. Yuba Power Products, Inc., 377 P.2d 897, 900-901 (Cal. 1962). Nevertheless, the First Circuit Court of Appeals ("First Circuit") has emphasized that under Puerto Rico law "**the manufacturer […] is not the insurer of every damage his products may cause.**" Quintana-Ruiz v. Hyundai Motor Corp., 303 F.3d 62, 71 (1st Cir. 2002) (quotation omitted) (emphasis added).

To establish a products liability, claim under Puerto Rico law, a plaintiff must show that:

> (1) [Defendant's] equipment has a defect, in any of its modalities; (2) the defect existed when the product left [Defendant's] control; (3) [Defendant] is in the business of selling this type of product; (4) the defect was the adequate cause of [Plaintiff's injuries]; and (5) [Plaintiff] use[d] the product in a manner that was reasonable and foreseeable by [Defendant].

Santos-Rodríguez v. Seastar Solutions, 858 F.3d 695, 698 (1st Cir. 2017) (quotation omitted).

The Puerto Rico Supreme Court has also "recognized three types of defects that trigger the application of the strict liability doctrine: "(1) manufacturing defects; (2) design defects, and (3) defects for insufficiency of warnings or instructions ['failure to warn']." González-Cabán v. JR Seafood, 199 P.R. Dec. 234, 241,

P.R. Offic. Trans. Op. Slip. at 3 (2017). *See also* Pérez-Trujillo
v. Volvo Car Corp. (Sweden)*,* 137 F.3d 50, 53 (1st Cir. 1998).

### 1. Manufacturing defects

Manufacturing defects occur when the product "differs from
the manufacturer's intended result or from other ostensibly
identical units of the same product line." Pérez-Trujillo, 137
F.3d at 53 (quotation omitted). Further, a manufacturing defect
exists when the product is "one that fails to match the average
quality of like products, and the manufacturer is then liable for
injuries resulting from deviations from the norm." Pérez v. Hyundai
Motor Co., 440 F.Supp.2d 57, 72 (D.P.R. 2006) (quotation omitted).
Lastly, generally when a plaintiff's claim revolves around a
manufacturing defect, "an inspection and evaluation of the
specific item that caused the injury is required to establish that
the item was defectively manufactured, or to refute that theory."
Talavera v. Ford Motor Co., 932 F. Supp. 2d 252, 256 (D.P.R. 2013)
(internal quotation omitted).

### 2. Design defects

To prove design defects, two tests are potentially available
"depending on the nature of the product." Carballo-Rodríguez v.
Clark Equipment Co., Inc., 147 F.Supp.2d 66, 71 (2001). These are:
"(1) a consumer expectation test, on which the plaintiff bears the
full burden [of proving a design defect]; and (2) a risk/utility
test, where the burden shifts." Quilez-Velar v. Ox Bodies, 2015 WL

728378, at *2 n.1 (D.P.R. 2015) (citation omitted). The first test requires that a plaintiff show that "the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." Carballo-Rodriguez, 147 F. Supp. 2d at 71 (quotation omitted). This means that the test "is reserved for cases in which the *everyday experience* of the product's users permit a conclusion that the product's designs violated *minimum* safety assumptions." Quintana-Ruiz, 303 F.3d at 77 (quotation omitted) (emphasis in original). The test "cannot be the basis of liability in cases involving complex technical matters." Id. (holding that the consumer expectations test was not applicable to case involving an airbag). *See also* Fremaint v. Ford Motor Co., 258 F.Supp. 2d 24, 30 (D.P.R. 2003). The District of Puerto Rico has abstained from using this test in a case involving such a seemingly simple product as an aircraft overhead bin. *See* Silva v. American Airlines, Inc., 960 F. Supp. 528, 533 (D.P.R. 1997).

The second test is the risk/utility test which requires that a plaintiff prove that the product's design proximately caused his injuries. *See* Collazo Santiago v. Toyota, 149 F.3d 23, 26 (1st Cir. 1998) (quotation omitted). If the plaintiff proves as much, the burden shifts to the defendant to prove that "the benefits of the design at issue outweigh the risk of danger inherent in such a design." Quintana Ruiz, 303 F.3d at 69 (quotation omitted). "The

risk-utility balancing test is designed to avoid converting the manufacturer into the insurer of every harm that arises out of a product from which the consumer derives utility." Álvarez-Cabrera, 2020 WL 3620204, at *4 (quotation omitted). The Court also notes that Puerto Rico courts have explained that "an important part of the risk-utility test is the question of whether there is a safer alternate design which is mechanically feasible." Fremaint, 258 F. Supp. 2d at 30. **"This analysis in turn hinges upon the availability of expert testimony on alternate design."** Id. (emphasis added).

   3. Failure to warn

   Under Puerto Rico law, a plaintiff who alleges a "failure to warn" claim must show that:

> (1) the manufacturer knew, or should have known of the risk inherent in the product; (2) there were no warnings or instructions, or those provided were inadequate; (3) the absence of warnings made the product inherently dangerous; [and] (4) the absence of adequate warnings or instructions was the proximate cause of plaintiff's injury.

Santos-Rodríguez, 858 F.3d at 697. Similarly, Puerto Rico courts have found that "[t]he duty to warn in general is limited to hazards not commonly known to the relevant public." González-Cabán, 132 F. Supp. 3d at 280 (quotation omitted). Thus, the plaintiffs must "adduce evidence that the absence of warnings made the product inherently dangerous." Hernandez Denizac v. Kia Motors Corp., 323 F. Supp. 3d 277, 286 (D.P.R. 2018). Courts have also

noted that "a failure to function is also per se insufficient to prove a product's inherent dangerousness so as to require additional warnings." Id.

### 4. Malfunction

A lack of expert evidence need not be fatal at the summary judgment stage in a products liability case. Per First Circuit jurisprudence, "a strict liability claimant may demonstrate an unsafe defect through direct eyewitness observation of a product malfunction and need not adduce expert testimony to overcome a motion for summary judgment." Pérez-Trujillo, 137 F.3d at 55. Therefore, **"[s]trict liability claimants may resort to an array of circumstantial evidence,** including direct observations regarding the malfunction of a product." Álvarez-Cabrera, 2020 WL 3620204, at *4 (internal quotation omitted) (emphasis added). This direct observation can then be used as "evidence of a defective condition." Velazquez v. Abbott Laboratories, 901 F. Supp. 2d 279, 293 (D.P.R. 2012). Alternatively, a claimant may choose to rely on other evidence, "such as similar accidents involving the same product, elimination of other possible causes of the accident, and proof tending to establish that the accident does not occur absent a manufacturing defect." Id. (citation omitted). The need for expert evidence thus depends on whether "the question is one of common knowledge such that lay people could 'reach the conclusion as intelligently as the witness.'" Id. (quotation omitted).

### III. FINDINGS OF FACT

Based on the parties' submissions and evidentiary materials at Dockets Nos. 87-9 and 98-1, and viewing the facts in the light most favorable to Plaintiffs, the Court enters the following findings of uncontroverted material facts:[1]

As to the July 24, 2016 accident

1. This is a product liability case involving a 20-pound portable propane cylinder tank ("Propane Cylinder") manufactured by defendant Worthington. (Docket 98-1 ¶ 1).

2. The Propane Cylinder was purchased by plaintiffs Mr. Muñiz Negrón and Mrs. Torres-Torres on April 2016 at the Sam's Club in Ponce, Puerto Rico operated by Wal-Mart Puerto Rico, Inc. Id. ¶ 2.

3. That same day, Plaintiffs filled the Propane Cylinder at Light Gas and took it home. Id. ¶ 3.

4. Mr. Muñiz-Negrón connected the Propane Cylinder to the clothes dryer and so it remained until the accident object of this case. Id. ¶ 5.

5. The Propane Cylinder was connected to the dryer by means of a regulator and a hose that was attached at one end to the regulator and at the other to the dryer. Id. at ¶ 6.

---

[1] References to a Finding of Fact shall be cited as follows: (Fact ¶ __).

6. To connect the regulator to the Propane Cylinder, Mr. Muñiz-Negrón used a wrench to tighten the regulator onto the valve of the Propane Cylinder. Id. ¶ 7.

7. According to the description given by Mr. Muñiz-Negrón to Eng. Baigés-Valentín as to the tightening of the regulator was that he rotated the regulator with his hand, hand-tightened it, and then took a wrench and basically tightened it between a half and a complete turn. Id. ¶ 9.

8. On July 24, 2016, about four months after buying the Propane Cylinder, Mr. Muñiz-Negrón decided to disconnect the Propane Cylinder from the clothing dryer and connect it to the barbecue. Id. ¶ 10.

9. To disconnect the propane cylinder, Mr. Muñiz-Negrón used a wrench to unscrew the regulator from the Propane Cylinder. Id. ¶ 11.

10. Before disconnecting the regulator, Mr. Muñiz-Negrón closed the valve of the Propane Cylinder. Id. ¶ 12.

11. After disconnecting the regulator, propane poured out of the valve through where it was disconnected. Id. ¶ 13.

12. Mr. Muñiz-Negrón attempted to put the regulator back with the help of Mrs. Ortiz Torres. Id. ¶ 15.

13. In the process at reattaching the regulator to the Propane Cylinder, there was an explosion that caused a blue flame. Id. ¶ 16.

14.  Mr. Muñiz-Negrón and Mrs. Ortiz-Torres sustained burns in their bodies, including, but not limited to, both of their arms and both of their legs. Id. ¶ 17.

As to the Propane Cylinder:

15.  The Propane Cylinder is composed of a 20-pound portable propane cylinder tank and a valve ("the Valve"). Id. ¶ 18.

16.  The Valve has a hand wheel on top that serves to open and close the flow of propane gas from the tank to the outside. Id. ¶ 19.

17.  The Valve has a female connection at the valve outlet. Inside this female connection of the Valve is a female insert ("the Insert"). The Insert accommodates the POL connector which is used to connect the regulator to the Valve. Id. at ¶ 20.

18.  The Valve has a security device inside to prevent the out flow of propane gas when the hand wheel is not in a total closed position unless there is a regulator connector screwed into the Valve outlet. Id. ¶ 21.

As to Mr. González-Padilla's background and qualifications:

19.  Mr. González-Padilla received a Bachelor of Arts degree in Business Administration from the University of Puerto Rico in 1978. (Docket No. 87-2 at 13).

20. He started working at his father's propane gas sale and distribution business on a full-time basis in 1989 until he retired around 2013-14. Id. at 23 and 26.

21. He testified that he has no background, training or experience in the design of propane gas cylinders, regulators, POL adapters or valves. Id. at 43-46.

22. He has no background, training or experience in the manufacture of propane cylinders or valves. Id. at 46.

23. Mr. González-Padilla has no training or experience in adequacy of warnings. Id. at 112.

As to Mr. González-Padilla's reports, opinions and methodology:

24. Mr. González-Padilla issued four reports in this case. (Docket No. 98-1 ¶ 50).

Mr. González-Padilla's First Report

25. Mr. González-Padilla's first report is entitled "Report on Results of Joint Inspection" and is dated April 17, 2018. It contains three findings based on a joint inspection of the Propane Cylinder conducted on April 3, 2018. (Docket 87-1 at 2-3).

26. The first finding is "the stem of the valve's handle has no outer thread, which makes the stem deficient." This finding of defect is based on his experience that "stems that don't have an outer thread are highly prone to getting stuck due to their design and manufacture." Id. at 3.

27.  The second finding is that in his opinion, "the valve got
     stuck because it did not have a stem with a complete outer
     thread all the way to the handle." <u>Id.</u>

28.  The third finding is that in his opinion:

> [T]he safety mechanism was defective because
> it had not closed automatically and was opened
> at the time of the test. […] In order to
> specify whether it is a manufacturing or
> design defect, the regulator needs to be
> removed, which was not done during this
> inspection and was left for a future occasion.
>
> <u>Id.</u>

29.  The first report does not disclose any support for Mr.
     González-Padilla's opinions other than the joint visual
     inspection and his experience. <u>Id.</u>

<u>Mr. González-Padilla's Second Report</u>

30.  Mr. González-Padilla's second report is entitled "Report
     on Condition of Seal Ring" and is dated October 30, 2018.
     It concerns the condition of the Valve insert's seal ring,
     also referred to as the o-ring, and contains four findings.
     <u>Id.</u> at 4.

31.  The first finding is that the "[t]he seal ring ('o-ring')
     of the valve that connects to the regular [sic.] is in
     damaged condition." <u>Id.</u>

32.  The second finding is "[t]he type of damage of the seal
     ring ('o-ring') has characteristics of damage caused by a
     manufacturing defect." <u>Id.</u>

33.  The third finding is "[t]he useful life of a seal ring ('o-ring') varies between five (5) and ten (10) years, depending on how much it is used." Id.

34.  The fourth finding is "[t]here are no warnings or instructions on the tank indicating that the seal ring ('o-ring') must be inspected before and after connecting the tank, which constitutes a defect of not providing necessary information to users." Id.

35.  The second report does not disclose any support for his opinions other than the examination of photographs taken by Eng. Baigés-Valentín and his experience. Id. at 4.

Mr. González-Padilla's Third Report

36.  Mr. González-Padilla's third report is entitled "Report on Threaded Interior Part that Contains the Rubber Seal" and is dated March 14, 2019. It contains four opinions. Id. at 5-6.

37.  The first opinion is "[t]he fracture of the interior threaded part was caused by a manufacturing defect, not exterior damage." Id. at 5.

38.  The second opinion is that "[t]he reason why the interior threaded part was fractured is that it could not withstand the pressure of the propane gas, the way such parts are supposed to withstand it. That is, the part did not function as it is expected to function." Id.

39.  The third opinion is that "[t]he fracture of the threaded
     part caused the O-ring seal to be displaced, deformed and
     to prevent the safety mechanism from closing automatically
     as it supposed to when the regulator is not exerting
     pressure on the spring of the safety mechanisms, causing
     the gas leak." Id. at 6.

40.  The fourth opinion is that "the stem of the handle of the
     valve does not have exterior thread, which renders the stem
     deficient. This deficiency caused the [sic.] to not be able
     to close completely, which also contributed to the gas
     leak, because it if had closed the leak would not have been
     caused." Id.

41.  His third report does not disclose any support for his
     opinions other than visual inspection of the threaded valve
     insert and his experience. Id. at 5-6.

Mr. González-Padilla's Fourth Report

42.  Mr. González-Padilla's fourth report is entitled "Report
     on Condition of POL Connector Nut" and it is dated July 8,
     2019. Id. at 7.

43.  His fourth report states that "[b]ased on [his] experience,
     it is [his] opinion that the nut of the POL connector was
     not the object of excessive torque." Id.

44. The report also states "[m]oreover, the tank is defective because there are no instructions about the maximum torque than can be applied to the POL connector." <u>Id.</u>

45. The report does not disclose any support for Mr. González-Padilla's opinions other than visual inspection of the POL connector and his experience. <u>Id.</u>

## Mr. González-Padilla's Deposition Testimony

46. Mr. González-Padilla did not review the documents produced by the manufacturer of the Valve at issue in this case. (Docket No. 87-2 at 51).

47. He did not perform any tests to determine if overtightening the gas regulator nut could cause the damage to the Valve that was observed during visual inspection. <u>Id.</u> at 85.

48. He did not test sample tanks and valves to test his theory on lack of overtightening. <u>Id.</u> at 92-93 and 135-36.

49. As to the useful life of the seal ring, Mr. González-Padilla stated that the basis for this opinion was his "experience." <u>Id.</u> at 110.

50. He testified that he had not seen any studies or analysis of the useful life of the seal ring. <u>Id.</u> at 111.

51. He also testified that he had not done his own studies or analysis of the useful life of the seal ring. <u>Id.</u>

52. He did not develop an alternative design or manufacturing process for the Valve. <u>Id.</u> at 154.

53.  He did not write an alternative warning for the cylinder.
     Id. at 154-155.

54.  He has not used any literature or standards to support his
     opinions. Id. at 155.

As to Eng. Baigés-Valentín's background and qualifications:

55.  Eng. Baigés-Valentín received a Bachelor of Science degree
     in mechanical engineering from the University of Puerto
     Rico, Mayagüez Campus, in 1986. (Docket No. 87-4 at 237).

56.  Eng. Baigés-Valentín received a Master's Degree in
     mechanical engineering from the Massachusetts Institute of
     Technology in 1989. Id.

57.  He received a Doctorate in Mechanical Engineering from the
     University of Florida in 1995. Id.

58.  Eng. Baigés-Valentín is not familiar with the manufacturing
     process for propane gas valves. Id. at 53.

59.  He testified that he is familiar with the manufacturing
     process of medical device types of valves. Id.

60.  He specified that he has worked with the testing and making
     of pressure release valves for the human body for liquids,
     but not for gas. Id. at 54.

61.  He also testified that the other type of valves he has
     worked with are check valves and liquids for fluid tanks
     in the inkjet industry. Id. at 56.

62. He has never worked with a manufacturer who designed propane gas valves. <u>Id.</u> at 57.

63. The design process of valves was not a part of any of the courses he taught. <u>Id.</u>

64. **He does not have any certifications in gas for the gas industry**. <u>Id.</u>

65. **He does not have any licenses for gas or the gas industry.** <u>Id.</u>

66. **His only license is his professional engineering license.** <u>Id.</u>

67. He does not know what codes apply to the propane tank and valves. <u>Id.</u> at 115.

<u>As to Eng. Baigés-Valentín's technical report, opinions and methodology</u>:

68. On or about September 17, 2018, Eng. Baigés-Valentín rendered a "technical report." (Docket No. 87-3 at 2).

69. The technical report notes that he was present at an August 17, 2018 inspection of the Propane Cylinder. <u>Id.</u> at 6.

70. The inspection revealed that: (a) the hand wheel could not be moved to open or close the Valve; (b) the Valve leaked when there was no regulator attached to it; (c) this leak meant the Valve's safety mechanism did not work. <u>Id.</u>

71. As to documents reviewed, the "technical report" discloses the following: (a) the Complaint; (b) inspection of the

tank on August 7, 2018; (b) Mr. González-Padilla's expert report. Id. at 10.

72.  The report's first finding is that "upon visual inspection, it can be seen that the hand wheel (that opens the tank's flow of gas to the valve's connection port (including the safety mechanism) [could not be moved]." Id. at 6 and 10.

73.  The second finding is that "upon visual inspection, it can be seen that the rubber seal/o ring at the regulator connection point shows damage - it does not look like new even if this tank was filled only once since it was bought. This rubber seal/o ring is defective." Id. at 10.

74.  The third finding is that:

> During the leak test, it was observed that when the tank is pressurized with air, there was air flow from the tank's valve even when there was no regulator connected to it. This means that the plunger/spring/safety mechanism was not working as expected since it should not allow gas leaks when there is no regulator attached to it.

> Id. at 10-11.

75.  The fourth finding is that:

> The valve of this 20-pound LPG tank was defective since it did not prevent the leak of gas when it was disconnected from the clothes dryer. It is expected that the safety mechanism would prevent the dangerous leak of gas when there is no regulator attached to it. If the valve had operated as expected, there would not be any unexpected flow of gas that could cause a fire.

Id. at 11.

Eng. Baigés-Valentín's Revised Technical Report

76.   On or about March 13, 2019, Eng. Baigés-Valentín issued a
      "revised technical report." Id. at 12.

77.   In the "revised technical report[,]" he added the
      observations from a January 25, 2019 inspection where the
      valve was disassembled. Id. at 22-25.

78.   The report contains photographs taken by Mr. González-
      Padilla of the valve components and the damage they
      suffered. Id.

79.   The report contains four findings. Id. at 16-17.

80.   The first finding is that "[u]pon visual inspection, it
      can be seen that the rubber seal at the regulator
      connection port shows damage - this rubber seal does look
      damaged even if this tank was filled only once since it
      was bought. This rubber seal is defective." Id. at 16.

81.   The second finding is that:

          The metal insert that houses the rubber seal
          is fractured. The fracture of this insert
          indicates that this part was defective and
          could not function properly (seal correctly).
          The fact that the system was used once and
          then failed suggested that there was an
          initial defect in this metal insert that
          resulted in the failure very early in the
          product's life. This failure is consistent
          with a material/manufacturing defect of this
          particular unit that diminished the part's
          resistance to the generated hoop stress from
          the LPG pressure (in the range of 125psi) and

> the stressed [sic] generated by the
> connection.

<u>Id.</u> at 16-17.

82.  The third finding is that:

> During the leak test it was observed that when
> the tank was pressurized with air, there was
> air flow from the tank's valve even when there
> was no regulator connected to it. This means
> that the plunger/spring/safety mechanism was
> not working as expected since it should not
> allow gas leaks when there is no regulator
> attached to it. This means the valve system
> was defective.

<u>Id.</u> at 17.

83.  The fourth finding is that "the valve of this 20-pound LPG

tank was defective since it did not prevent the leak of

gas when the regulator was disconnected. It is expected

that the safety mechanism would prevent the dangerous leak

of gas when there is no regulator attached to it." <u>Id.</u>

### Eng. Baigés-Valentín's "Addendum to technical report"

84.  On or about July 5, 2019, Eng. Baigés-Valentín issued an

"Addendum to technical report" ("Addendum") to comment on

Defendant's experts' reports. <u>Id.</u> at 26.

85.  In the Addendum, Eng. Baigés-Valentín presents various

theories why overtightening did not cause the fracture or

failure of the valve's component. <u>Id.</u> at 28-29.

86.  In the Addendum, he opines that "the tank instructions do

not specify tightening torque limits." <u>Id.</u> at 29.

Eng. Baigés-Valentín's Deposition Testimony

87.  At his deposition, Eng. Baigés-Valentín' testified that his "opinion" is limited to the operation and materials of the Valve. (Docket No. 87-4 at 8).

88.  He has not developed an alternative design for the Valve or the Propane Cylinder's components. Id. at 41, 132-134.

89.  He has not developed alternative warnings that should have been provided with the Valve or cylinder. Id. at 41 and 69.

90.  He did not review any documents provided by Cavagna S.P.A. (the manufacturer of the Valve) for this case. Id. at 41-42.

91.  Eng. Baigés-Valentín did no cost-benefit analysis for the Valve, cylinder or warnings. Id. at 42-43.

92.  He has never worked in the propane industry. Id. at 43.

93.  He has never worked in any industry where he designed valves for propane gas. Id.

94.  He has never worked in an industry where he designed cylinders. Id.

95.  He testified that he spoke with Mr. Muñiz-Negrón a couple times by phone, but not with the other two Plaintiffs. Id. at 44 and 71.

96.  He determined that the Valve was not overtightened based on what Mr. Muñiz-Negrón told him. Id. at 48.

97.  Eng. Baigés-Valentín did not do any subsequent testing or
     analysis to reach the conclusion that the valve was not
     over-torqued. Id. at 47.

98.  He has not done any numerical analysis, studies or
     experiments with respect to the Valve. Id. at 69 and 113.

99.  He did not read any depositions from this case. Id. at 71.

100. He did not rely on or cite any standards when forming his
     opinions. Id.

101. He did not consult any treatises, authorities or literature
     in forming his analysis. Id. at 41 and 72.

102. Eng. Baigés-Valentín did not compare the design and
     manufacture of the Valve to other valves. Id. at 72.

103. To create the type of damage to the valve's rubber seal
     depicted in photo 3 of his "technical report", Eng. Baigés-
     Valentín would have to "have […] the actual device to make
     a measurement of the tightening torque and the actual
     pressure there," but he has not done that. (Docket Nos.
     87-4 at 111; 87-3 at 6-7).

104. To perform such a test, he would need "a sample that
     represented the actual batch of rubber seals that were
     produced at the time," and he did not do that. (Docket No.
     87-4 at 111).

105. He did no analysis to determine if the POL connector was
     overtightened into the Valve. Id. at 112-113.

106. He has never tested a sample regulator and sample valve
and tried to overtighten it to see what would happen. Id.
at 146-47.

### IV.   ANALYSIS

### A. Plaintiffs' experts are not qualified to testify as experts in this case:

Mr.  González-Padilla  and  Eng.  Baigés-Valentín  are  not
qualified to testify as experts in this case about alleged design,
manufacturing  or  warning  defects  in  the  Propane  Cylinder  or  the
Valve  in  question  because  they  lack  the  requisite  "knowledge,
skill, experience, training, or education" to do so as required by
Fed. R. Evid. 702.

Mr.  González-Padilla  is  a  businessman  by  education  and
experience. He has a degree in business administration from the
University  of  Puerto  Rico  and  worked  for  several  decades  as  a
propane gas distributor. (Facts ¶¶ 19-20). By his own admission,
he  does  not  any  have  knowledge,  skill,  experience,  training  or
education  in  the  design  and  manufacture  of  propane  gas  cylinders
and  propane  gas  valves  or  in  the  adequacy  of  warnings  and  thus  is
unqualified  to  testify  about  defects  in  this  case.  (Facts  ¶¶  21-
23). *See* Deimer v. Cincinnati Sub-Zero Products, Inc., 58 F.3d 341
(7th Cir. 1994)(excluding testimony of expert who did not have the
"requisite  experience  to  assess  a  medical  device's  suitability  for
its  intended  purpose  within  the  hospital  environment  or  to  assess
its  adherence  to  the  prevailing  standards  for  similar  machines.");

Silva, 960 F.Supp. at 532 (holding that while a flight attendant
may be "well-versed and trained in a particular aircraft and its
emergency procedures" given that he has no specialized knowledge
to offer opinions as to whether an airline should have warned
passengers about the risk of hitting overhead bins, he was
unqualified to serve as an expert witness).

    At first blush, the question of whether Eng. Baigés-Valentín
is qualified would seem to pose a closer question. He has an
impressive education and curriculum as a mechanical engineer which
includes a PH.D. in that field. (Facts ¶¶ 55-57). But, by his own
admission, he too lacks knowledge, skill, experience, training or
education in the design and manufacture of propane gas cylinders
and propane gas valves. (Facts ¶¶ 58-67). He is therefore
unqualified to testify about defects in this case. Puerto Rico
courts have held that that to be qualified, **an expert must have
specific knowledge, not mere capacity to acquire knowledge.**"
Silva, 960 F.Supp. at 531 (emphasis added). *See also* Acosta-Mestre
v. Hilton-Intern. of Puerto Rico, 1997 WL 373734 (D.P.R. 1997)
(striking mechanical engineer who had no prior experience with
product object of the case).

   **B. Plaintiffs' experts' opinions are not the product of
       reliable principles and methods**

    Plaintiffs' experts' opinions are not the product of reliable
principles and methods. Neither González-Padilla nor Eng. Baigés-

Valentín conducted any tests to validate any of their hypotheses. (Facts ¶¶ 47-48, 51 and 97-98, 105-106). Thus, their opinions are not reliable and should not reach the jury. *See e.g.*, <u>Ortiz-Semprit v. The Coleman Company, Inc.</u>, 301 F.Supp. 2d 116 (D.P.R. 2016)(excluding testimony of expert that did not conduct any testing and had not done any prior testing, experiments or published in the relevant field); <u>Trumps v. Toastmaster, Inc.</u>, 969 F.Supp. 247 (S.D.N.Y. 1997)(excluding testimony as to causation of a fire when proffered expert did not conduct testing to replicate the accident or test his hypothesis).

Testing is "not an absolute pre-requisite to the admission of expert testimony." <u>Quilez-Velar v. Ox Bodes, Inc.</u>, 823 F.3d 712, 719 (1st Cir. 2016) (quotation omitted). But, Rule 702 is intended to "ensure that when expert witnesses testify in court, they adhere to the same standards of intellectual rigor that are demanded in their professional work." <u>Cummins v. Lyle Industries, Inc.</u>, 93 F.3d 362, 369 (7th Cir. 1996). Ways of accomplishing this goal, include "the review of experimental, statistical, or other scientific data generated by others in the field." <u>Id.</u>

Here, **neither expert sought to consult third-party sources of data**. (Facts ¶¶ 50, 54, 99-101). Focusing on Eng. Baigés-Valentín, it bears repeating that he did not rely on any standards in forming his opinion nor consulted treatises, authorities or literature in forming his analysis. (Facts ¶¶ 99-101). *See e.g.*, <u>Mutersbaugh v.</u>

Gen. Elec., Inc., 2019 WL 1409379 (N.D. Ohio 2019), appeal
dismissed, 2019 WL 8631808 (6th Cir. 2019) (granting summary
judgment when expert's opinion as to why a GE gas stove was
defective was based on an improper methodology given that he failed
to inspect the product and there was a lack of testing on the
same). In Mutersbaugh, the Northern District of Ohio struck the
expert's testimony because his opinion did "not allow for any form
of testing or review. […] [He] admitted that he had not done any
calculations to support his findings. He admitted that he had done
no modeling and admitted he had done no sketches." Id. at *2. The
Southern District of Ohio held similarly in Stibbs v. Mapco, Inc.
when it struck expert testimony in a case alleging a defective
propane-fueled water heater. See Stibbs v. Mapco, Inc., 945 F.
Supp. 1220, 1223–24 (S.D. Iowa 1996). This because "[w]hile there
is no one right way to achieve scientific or technical validity in
the analytical process, […] **the failure of [the experts] to engage
in testing of critical aspects of their hypothesis undermines the
validity of their resulting 'particle theory' of causation.**" Id.
(emphasis added).

The Court also notes that at least one of the experts, Mr.
González-Padilla, included a finding in his report regarding the
"useful life" of the "seal ring" of the Propane Cylinder which he
places to be about five to ten years. (Fact ¶ 33). Yet this
conclusion is only based on his experience and he admitted that he

never saw any studies or analysis of the "useful life" of the seal ring nor did he conduct any analysis or studies of his own. (Facts ¶¶ 49-51). *See also*, Fail-Safe, L.L.C. v. A.O. Smith Corp., 744 F. Supp. 2d 870, 892-93 (E.D. Wis. 2010) (striking expert testimony after noting that "perhaps the most egregious assumption in Dr. Keegan's proffered testimony: that the product lifespan will be ten years. As confirmed by the two witnesses' respective testimony, there appears to be no rhyme or reason for the ten year product lifespan."); Hamilton v. Emerson Elec. Co., 133 F. Supp. 2d 360, 377-78 (M.D. Pa. 2001) (excluding expert testimony and granting summary judgment because plaintiff's "continued use of the miter saw precludes a reasonable inference that the saw was defective when it left [Defendant's] control.") The Hamilton Court found this to be especially true because the plaintiff had "failed to produce any evidence from which a jury might determine a reasonable life-span or usage limit for this particular product." Id.

Lastly, the lack of qualifications also weighs in favor of finding Mr. González-Padilla and Eng. Valentín-Baigés' opinions unreliable. (Facts ¶¶ 21-23 and 58-67). *See also* United States v. Taylor, 154 F.3d 675, 683 (7th Cir. 1998) (holding that when analyzing the reliability of an expert, "courts properly consider whether the proffered witness possesses genuine expertise in the field and whether the testimony adheres to the standards of intellectual rigor demanded in the profession."); In re

Independent Service Organization Antitrust Litigation, 85 F. Supp.
2d 1130, 1163 (D.Kan. 2000).

**C. Plaintiffs have not made a prima facie case for products
liability under any of the modalities of defects recognized
by Puerto Rico law.**

1. As to the manufacturing defect claim:

Even if the Court had not stricken the proffered experts'
opinions and expected testimony, Plaintiffs would still lack
relevant evidence to establish a *prima facie* manufacturing defect
claim. Neither Mr. González-Padilla nor Eng. Baigés-Valentín
compared the Valve involved in the accident with the manufacturer's
plans for the Valve, or other valves from the same product line,
to identify any deviation or non-conformance in the valve or its
components such as the seal. (Facts ¶¶ 46, 48, 90-91 and 102.)
Thus, Plaintiffs lack competent relevant evidence to assert that
the Propane Cylinder valve involved in the accident "differ[ed]
from the manufacturer's intended result or from other ostensibly
identical units of the same product line." Pérez-Trujillo, 137
F.3d at 53 (quotation omitted). Plaintiffs also failed to show,
via expert testimony, that propane cylinders manufactured by
Worthington or any of their components failed to "match the average
quality of like products." Pérez, 440 F.Supp.2d at 72 (quotation
omitted). Summary judgment is thus proper. *See* Bryant v. Giacomini,
S.P.A., 391 F.Supp. 2d 495, 499-500 (N.D. Tex. 2005)(granting
summary judgment because plaintiff did not provide "evidence

identifying the manufacturer's plans for the [gas] valve at issue nor [did] they point out to the existence of a nonconformance with the plan that made the valve unreasonably dangerous."); Mutersbaugh, 2019 WL 1409379, at *3 (granting summary judgment because the expert "never tested his theories on similar components and fails to adequately explain why this testing could not be done.").

Finally, other judges in this District have held that a failure to cite industry standards weighs towards striking an expert witness in defect cases. In Acosta-Mestre, the court struck an expert witness who had failed to perform "a cost-benefit analysis," had no "familiarity outside the context of a civil lawsuit with" the product object of the case, had no "familiarity with [its] design, manufacturing, or marketing" and who was not "familiar with the industry standards" for the product's design. Acosta-Mestre, 1997 WL 373734, at *3. *See also* Fedelich v. Am. Airlines, 724 F. Supp. 2d 274, 280 (D.P.R. 2010) (striking an expert witness because he did not "research accident rates, the design of the machinery, nor does he cite industry safety standards.").

2. As to the design defect claim:

Likewise, even if the Court had not stricken the proffered experts' opinions and expected testimony, Plaintiffs would still lack relevant evidence to establish a *prima facie* design defect

claim. First, Plaintiffs failed to meet their burden of proof under a consumer expectations theory. The critical question under the consumer expectations test is whether the "circumstances of the failure *permit an inference that the product's design* performed below the legitimate, commonly accepted minimum safety assumptions of ordinary consumers." Bispo v. GSW, Inc. 361 Fed. Appx. 834 (9th Cir. 2010) (reversing in part but affirming the lower court's decision to not apply the consumer expectations test to a claim of defective gas valve). The Bispo Court explained that it saw "no reason to disturb the district court's conclusion that ordinary consumers have no firm expectations regarding the gas pressure that safety valves should withstand." Id. at 836. *See also* Marmont v. Bernzomatic Corp., 2018 WL 6252500, at *17 (C.D. Cal. 2018) (holding that "because resolving the question of what caused the [pressure release valve of a propane cylinder] core's failure to vent on the day of the incident requires a 'careful assessment of feasibility, practicality, risk, and benefit,' the consumer expectations test is unavailable as a matter of law.")(quotation omitted).

Here, no evidence of ordinary consumers' expectations regarding the safety of gas propane valves was proffered by Plaintiffs in opposition to Worthington's *Motion for Summary Judgment*. The only reference to a "consumer" of the product in question in Mr. González-Padilla's deposition concerns whether he

would tell a consumer to place the tank indoors or outside. (Docket
No. 87-2 at 127). Similarly, Eng. Baigés-Valentín only referenced
a "consumer" of the Propane Cylinder when he stated that "[t]his
is a device for common use, it's not an industrial device,
typically. It's something that you and I would use at home in a
tank." (Docket No. 87-4 at 126). These comments however, without
additional supporting evidence, are not probative of ordinary
consumer's expectations and do not refute that the product object
of this case is one "involving complex technical matters" and
therefore outside the consumer expectations test. *See also*
Collazo-Santiago v. Toyota Motor Corp., 937 F. Supp. 134 (D.P.R.
1996), aff'd, 149 F.3d 23 (1st Cir. 1998) (holding inapplicable
the consumer expectations test because the ordinary consumer would
probably not know about the technical aspects of the airbag design
in TMC cars). Here, just as in Collazo-Santiago, "it is highly
unlikely that an ordinary consumer would know what technical
considerations influenced the design" of the Propane Cylinder or
its components. Id. at 140. Moreover, without evidence to the
contrary, consumers would likely not "have any specific
expectations as to how safe [propane cylinders] should be."

Second, Plaintiffs also failed to meet their burden of proof
under the "risk/utility test." Neither of Plaintiffs' proffered
experts developed an alternate design or otherwise performed any
testing to support their opinions. (Facts ¶¶ 52 and 88). In fact,

both experts admitted to not developing an alternative design for
the Propane Cylinder or its components in their respective
depositions. Id. The District of Puerto Rico has held that
"**[w]ithout any expert testimony, plaintiff cannot establish an
alternate, safer design and meet his burden of proof**." Fremaint,
258 F. Supp. 2d at 30 (emphasis added). *See also* Landau v.
Spenuzza, Inc., 2009 WL 910367, at *6 (E.D.N.Y. 2009) (striking
expert witness because his conclusions that the deep fat fryer was
defectively designed are not supported by reasoning or
explanation, he "cites no industry standards, and he discusses
neither the feasibility of the alternative designs he proposes nor
the reasons for the existing design." Id. Similarly, here
Plaintiff's experts attempt "to serve as [their] own authority,
and as a result" their opinions "lack[] a reliable foundation."
Id.

    3. As to the failure to warn claim:

    Plaintiffs did not adduce any evidence that Worthington knew
or should have known of a risk inherent in the product which is
the first element of a claim for failure to warn under Puerto Rico
law. *See* Santos-Rodríguez, 858 F.3d at 697. Neither Mr. González-
Padilla nor Eng. Baigés-Valentín examined any documents produced
by the Valve manufacturer. (Facts ¶¶ 46 and 90). Further, Eng.
Baigés-Valentín also testified that he is not familiar with the
manufacturing process of propane gas valves nor that has he worked

with a manufacturer of the same. (Facts ¶¶ 58 and 62). Lastly, both experts also failed to develop alternative warnings that should have been provided with the Valve or cylinder for the Propane Cylinder and its components. (Facts ¶¶ 53 and 89).

Instead, they simply conclude by *ipse dixit* that the Valve was defective for failure to warn that overtightening could damage the Valve while simultaneously denying that overtightening of the regulator could have been a cause of the damage to the valve insert and of the accident. Id. The First Circuit, citing Supreme Court precedent, has long held that "**nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert**." Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998) (quotation omitted) (emphasis added). *See also* Ortiz-Semprit, 301 F.Supp. 2d 116.

Further, Plaintiffs have not pointed to *any* evidence that would support an inference that Worthington knew or, at the very least, *should* have known of a risk inherent in the valve. Considering the foregoing, Plaintiffs failed to meet their burden of production on the "failure to warn" claim. The Court need not address the remaining elements of a failure to warn claim under Puerto Rico law.

4. <u>Plaintiffs have not raised a trial-worthy "malfunction"
   claim</u>:

Mr. González-Padilla admitted in his deposition that he did
not test sample tanks and valves to test his theory on lack of
overtightening. (Fact ¶ 48). Likewise, Eng. Baigés-Valentín also
admitted that he had not performed any tests to rule out
overtightening as a cause of the accident. (Facts ¶¶ 105-106).
This omission is particularly glaring on the latter's part given
that he readily described at his deposition how he would conduct
such an experiment and the fact that he dedicated a part of the
"Addendum to the technical report" to presenting various theories
as to why overtightening did not cause the fracture or failure of
the Valve's component. (Facts ¶¶ 85-86 and 103-104). Moreover, he
stated that he determined that the Valve was not overtightened
based on what Mr. Muñiz-Negrón told him. (Fact ¶ 96). Apart from
what Mr. Muñiz-Negrón told him, **he did not do any subsequent
testing or analysis to reach the conclusion that the valve was not
over-torqued**. (Facts ¶ 97). Without more than these conclusory
allegations, the Court cannot determine that the Propane Cylinder
object of this case malfunctioned. *See e.g.*, <u>Landau,</u> 2009 WL
910367, at *5. In <u>Landau</u>, the Eastern District of New York held
that failure to evince that the manufacturing defect was not due
to overpressurization proved fatal to plaintiffs' claim. <u>Id.</u> The
Court concluded therein that the "plaintiffs offer no basis, other

than speculation, on which to conclude that the fire was caused by the deep fryer or the gas valve rather than the gas piping or installation." Id.

Consequently, Plaintiffs here have not raised a trial-worthy "malfunction" claim as they have not eliminated other potential causes of the accident such as overtightening. The District Court of Puerto Rico has held that "the malfunction theory of liability requires eliminating 'all probable causes other than a defect, of the malfunction.'" Álvarez-Cabrera, 2020 WL 3620204, at *8) (quoting Makuc v. American Honda Motor Co., Inc., 835 F.2d 389 (1st Cir. 1987)). Lastly, sister courts within the First Circuit have reached the same conclusion. See also Carifio v. Benetton Sportsystem USA, Inc., 2005 WL 1527801, at *5 (D. Mass. 2005) ("In order for the inference of a product defect to be drawn from the product's malfunctioning, the plaintiff must eliminate other reasonable causes of the malfunctioning.").

5. Other:

In addition to the strict liability claims, Plaintiffs sought to assert, negligent design, negligent manufacturing, negligence per se and breach of implied warranty. (Docket No. 1 at 1). The lack of expert evidence means that plaintiffs cannot prove their claims under these negligence theories either. See Lawes v. CSA Architects and Engineers LLP., 963 F3d. 7, 89 (1st Cir. 2020)("In

negligent design cases like this one, experts are needed to educate
the jury on the industry-specific standard of care that applied").

Plaintiffs also alleged breach of warranty and fraud in their
*Complaint*. (Docket No. 1 at 1). Both claims warrant dismissal for
different reasons. First, the breach of warranty claim is time-
barred. Id. at 20. The Puerto Rico Civil Code states that a
plaintiff has six-months from the date of delivery of the product
to commence an action for hidden defects. *See* Torres-Mas v. Carver
Boat Corp., 233 F. Supp. 2d 253, 257 (D.P.R. 2002)("If timely
notice is given, the statute of limitations to initiate suit for
hidden defects is six (6) months from the date of delivery as
provided for in art. 1379 the Puerto Rico Code for *aedilitian*
actions, P.R.Laws Ann. tit. 31, 3847.") Here, Plaintiffs bought
the Propane Cylinder in **April 2016** but filed the present suit on
**July 20, 2017**. (Docket No. 1; Fact ¶ 2). Moreover, Plaintiffs have
presented no communication between the parties within six months
after purchasing the Propane Cylinder which could toll the statute
of limitations period. Thus, given that more than six months have
elapsed between the date when Mr. Muñiz-Negrón purchased the
Propane Cylinder and when the present suit was filed, Plaintiffs
breach of warranty claim is time-barred. Even if the present claim
for breach of warranty is not time-barred, Plaintiffs still fail
to present a valid claim that the Propane Cylinder was defective.

Plaintiffs' fraud claim also fails because they have not complied with Fed. R. Civ. P. 9(b) which posits that a party alleging fraud must "state with particularity the circumstances constituting fraud or mistake." The First Circuit has held that under this particularity requirement, a fraud claim must contain "specifics about the time, place, and content of the alleged false representations." Woods v. Wells Fargo Bank, N.A., 733 F.3d 349, 358 (1st Cir. 2013) (quotation omitted). A review of the *Complaint* shows that these requirements are **nowhere to be found**. Hence, Plaintiffs' fraud claims warrant dismissal given that they "have failed to plead the elevated factual standard required under fraud allegations." Gonzalez-Camacho v. Banco Popular de Puerto Rico, 318 F. Supp. 3d 461, 495 (D.P.R. 2018), aff'd in part, dismissed in part, 2020 WL 5543934 (1st Cir. 2020) (citation omitted).

## V.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Worthington Cylinder Corporation's *Motion In Limine and For Summary Judgment* at Docket Nos. 87 and 89. Judgment dismissing the *Complaint* **WITH PREJUDICE** shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico this 30th day of March 2021.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge